242 N.J. Super. 195 (1990)
576 A.2d 316
SUSAN JONES, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR JANE JONES, A MINOR, PLAINTIFF-APPELLANT,[*]
v.
ROBERT JONES AND SARAH JONES, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 1990.
Decided June 29, 1990.
*197 Before Judges KING, BAIME and KEEFE.
Kathleen A. Sheedy argued the cause for appellant (Cassidy, Foss & San Filippo, attorneys; Louis B. Youmans on the brief).
Bernard M. Reilly argued the cause for the guardian ad litem (Dowd & Reilly, attorneys; no brief was filed).
John G. Colannino argued the cause for respondents (John G. Colannino on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This appeal presents questions of first impression. Plaintiff Susan Jones (Susan), independently and as guardian ad litem on behalf of her minor daughter, Jane Jones (Jane), instituted this action seeking compensatory and punitive damages against her parents, alleging that her father, Robert Jones (Robert), with the connivance of her mother, Sarah Jones (Sarah), sexually abused her over a protracted period of time. Plaintiff claimed that the birth of Jane, who is now 14 years of age, was the product of this incestuous relationship. The Law Division judge granted summary judgment and dismissed plaintiff's *198 independent claim, finding that the two-year statute of limitations had expired under N.J.S.A. 2A:14-2. The judge transferred Jane's support and tort claims to the Family Part and appointed a guardian ad litem to protect her interests.
At issue is whether the mental trauma suffered by plaintiff as the result of her father's alleged sexual misconduct serves to toll the statute of limitations. Closely intertwined with this question is whether the duress allegedly exerted by plaintiff's father had the effect of extending the limitations period.
We hold that factual questions were presented with respect to whether the psychological sequelae flowing from the alleged acts of sexual abuse were so severe as to constitute "insanity" under N.J.S.A. 2A:14-21, thereby extending the period of limitations. We also conclude that genuine issues of material fact were raised as to whether defendants' allegedly coercive acts and threats were such as to deprive plaintiff of her free will and whether such duress was so compelling as to toll the statute of limitations.

I.
Our recital of the facts is derived from the pleadings as well as the certifications and affidavits submitted by plaintiff in opposition to defendants' motion for summary judgment. Defendants Robert and Sarah are the natural parents of Susan. The infant plaintiff, Jane, was born on June 5, 1976. Susan alleges that Jane was the product of an incestuous relationship forced upon her by her father, Robert. It is undisputed that Jane suffers from a genetic disorder known as homocystinuria, which is characterized by mental deficiencies, visual impairment and musculoskeletal deformities. Susan contends that these handicaps were engendered by Jane's incestuous conception.
We need not recount at length the sordid facts relating to Robert's alleged sexual misconduct. According to Susan, her father commenced this course when she was approximately 11 years old. Initially, Robert allegedly found various excuses to *199 have Susan sleep in his bed with him. During this period, Robert is alleged to have perpetrated several acts of sexual abuse short of penetration, repeatedly impressing upon Susan the need for secrecy. Susan claims that the two ultimately engaged in sexual intercourse and continued this pattern on a regular basis "at least once a week."
According to Susan, she "lived in terror of Robert" throughout the years of abuse. Fearful of continuation of the incestuous relationship, Susan claims that she was even more panicked over the prospect of disclosure. "Racked with guilt and shame and terrified lest anyone learn of her secret," Susan asserts that she ultimately repressed all awareness of her incestuous relationship with her father.
Susan contends that Robert repeatedly threatened to kill her if she were to disclose his acts of abuse. According to Susan, her father regularly beat her in order to reinforce these threats. On several occasions, Robert allegedly attempted to suffocate her. Susan claims that these acts continued until the early months of 1983. In her certification, Susan alleged that she "still ha[s] nightmares" after which she awakes "sweating and shaking," thinking that her father "is coming after [her]."
According to Susan, the sexual abuse, which in its later stages is said to have taken the form of forcible rape, continued unabated over the years. In 1983, however, Susan began to receive counselling from Jean Heller, a psychiatric social worker at Riverview Hospital. Heller's notes for August 21, 1984 indicate that Susan, for the first time, revealed her father's alleged acts of sexual abuse. Susan claims that in September 1984 she "finally broke loose from the prison of mental and physical dependence" and was able to recount the details of her incestuous relationship with her father.
On October 4, 1984 Susan filed a criminal complaint, alleging Robert's sexual assaults. As a result, Robert was arrested and the Division of Youth and Family Services (DYFS) removed Jane from defendants' home where she had apparently resided *200 since her birth. According to Susan, after Jane was placed in foster care, she began making comments which "clearly communicated" the fact that Robert was abusing her. Susan's allegations of sexual abuse were presented to a grand jury which returned a "no bill," apparently because the statute of limitations had expired.
On February 15, 1985 Sarah filed a complaint against Susan and DYFS, seeking permanent custody of Jane. During the custody proceedings, the Family Part ordered Susan's father to undergo an HLA blood test. The results indicated that Robert's "probability of paternity" with respect to Jane was 99.83%. When the biological relationship between the two is taken into account, the "probability of paternity" is said to be 99.79%. On June 11, 1985 the Family Part awarded temporary custody to Susan, permitted limited visitation by Sarah and forbade any visitation by Robert.
On October 11, 1985 Susan, in her own right and as guardian ad litem for her daughter Jane, commenced the present action. Factually, the allegations contained in the complaint are crystal clear. Susan contends that beginning in her childhood, her father embarked upon a course of sexual abuse which continued into her adulthood and culminated in the birth of Jane. In a legal sense, the complaint is inartfully drafted by original counsel. Apparently, Susan seeks compensatory and punitive damages based upon legal theories of battery, intentional infliction of emotional distress, "wrongful birth" with respect to her independent claim, and "wrongful life" as to the cause of action asserted on behalf of Jane. See Procanik by Procanik v. Cillo, 97 N.J. 339, 347-348, 478 A.2d 755 (1984). We need not probe further into the substance of the causes of action alleged since the sole issue presented here pertains to the statute of limitations.[1]
*201 In this respect, we note that it is essentially undisputed that the last acts of alleged sexual abuse occurred in January 1983, when Susan left her parents' home. As we mentioned earlier, Jane was born in 1976. The complaint was thus filed two years and nine months from the date of the last act of alleged sexual misconduct and some nine years following Jane's birth. Defendants moved for summary judgment, claiming that the statute of limitations had expired.
In order to avoid the consequences of the statute, Susan claimed that Jane's action was preserved by her infancy under N.J.S.A. 2A:14-21, a point which is not in dispute. See Tyson v. Groze, 172 N.J. Super. 314, 411 A.2d 1170 (App.Div. 1980). With respect to her independent claims, Susan did not differentiate between her causes of action for battery, infliction of emotional distress and wrongful birth. As to all of her claims, Susan asserted that the limitations period was tolled by reason of her "insanity." More specifically, Susan claimed that the mental trauma caused by her father's sexual abuse was so disabling as to impair her ability to institute her action prior to the expiration of the statute of limitations.
In support of her assertion, Susan presented the treatment notes of her psychologist, who was seriously ill and thus unable to provide a personal certification. Susan also submitted the affidavit of Howard Silverman, a psychologist. Although Dr. Silverman had not examined Susan, it was his opinion that individuals subjected to childhood sexual abuse often find it impossible to communicate and describe such misconduct. According to Dr. Silverman, "psychological disability on the part of the victims [is] common."
*202 Susan further claimed that her father's coercive acts, physical assaults and explicit threats served to excuse her failure to institute suit in a timely fashion. She asserted that the duress exerted by defendants was so compelling as to prevent her from filing suit within the limitations period.
The Law Division judge granted defendants' motion for summary judgment, finding as a matter of law, that Susan was able to file a complaint at least as of the date she left her parents' home in January 1983. Since two years and nine months had passed from that date, the judge determined that Susan's independent causes of action were time-barred. The judge transferred Jane's support, paternity and tort claims to the Family Part. He ordered that the guardian ad litem he had appointed previously continue to represent her interests. This appeal followed.[2]

II.
We are convinced that the issues raised by Susan's allegations of mental impairment and duress should not have been resolved in summary fashion. Instead, a plenary hearing should have been conducted.
We reach this conclusion notwithstanding our recognition of the salutary purposes served by a statute of limitations. *203 The most important of these purposes is the security and stability of human affairs created by eventual repose. Galligan v. Westfield Centre Service, Inc., 82 N.J. 188, 191-192, 412 A.2d 122 (1980); Tevis v. Tevis, 79 N.J. 422, 430, 400 A.2d 1189 (1979); Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 115, 299 A.2d 394 (1973); State v. United States Steel Corp., 22 N.J. 341, 358, 126 A.2d 168 (1956). Separate from the interest of repose is the prospective defendants' ability to respond to allegations made against them. By penalizing unreasonable delay, "such statutes induce litigants to pursue their claims diligently so that answering parties will have a fair opportunity to defend." Galligan v. Westfield Centre Services, Inc., 82 N.J. at 192, 412 A.2d 122; see also Union City Housing Auth. v. Commonwealth Trust Co., 25 N.J. 330, 335, 136 A.2d 401 (1957). So too, statutes of limitations "spare the courts from litigation of stale claims." State v. Standard Oil Co., 5 N.J. 281, 295, 74 A.2d 565 (1950), quoting Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628, 1635 (1945). "Once memories fade, witnesses become unavailable, and evidence is lost, courts no longer possess the capacity to distinguish valid claims from those which are frivolous or vexatious." Galligan v. Westfield Centre Services, Inc., 82 N.J. at 192, 412 A.2d 122.
We emphasize, however, that the effect of a statute of limitations is to deny access to our courts. Unswerving, mechanistic application of statutes of limitations would at times "inflict obvious and unnecessary harm upon individual plaintiffs" without materially advancing the objectives they are designed to serve. Ibid. The legislative and judicial response to such inequities has been to provide certain statutory exceptions and fashion equitable remedies to avoid the injustice which would result from a literal reading of the general statutory language. Id. at 192-193, 412 A.2d 122. We are concerned here with two such exemptions, one statutorily created, insanity, and the other judicially devised, duress.

*204 A. Insanity

We first consider plaintiff's claim that the limitations period was tolled by reason of her insanity. The operative statute, N.J.S.A. 2A:14-21, provides "[i]f any person ... shall be, at the time of any such cause of action ... accruing ... insane, such person may commence such action ... within such time as limited by such sections, after his coming ... of sane mind." This statute has deep common law roots. Its genesis can be traced to a statute adopted in 1623 which dealt with specific limitations of actions and made the first references to insanity as a disability which would toll the limitations period. See 21 James 1, c. 16 (1623), quoted in Kyle v. Green Acres at Verona, Inc., 44 N.J. 100, 103-104, 207 A.2d 513 (1965). This law was in effect in New Jersey until 1799, see N.J. Const. (1776), Arts. XXI and XXII, when the General Assembly enacted a statute of limitations which had a savings clause almost identical to that of 21 James 1, c. 16. Paterson's Laws, 352. Although the limitations statute has been revised over the years, see Laws of New Jersey (1820), p. 46; Laws of New Jersey (1841), p. 48; Harrison, Public Laws of New Jersey, (1843), p. 428; Statutes of New Jersey (1847), p. 92; Rev. 1877, p. 594; 3 Compiled Statutes of New Jersey (1709-1910), p. 3164-3165; R.S. 2:24-4 (1937), the exemption tolling the requisite limitations period during insanity has at all times been retained.
Despite its ancient lineage, the statute has been cited in relatively few published opinions. In Kyle v. Green Acres at Verona, Inc., our Supreme Court, after tracing the statute's historical antecedents, held that N.J.S.A. 2A:14-21 "foreclose[d] a tolling of the running of the [limitations period] unless plaintiff was [insane] at the time the cause of action accrued...." 44 N.J. at 106-107, 207 A.2d 513. The Court carved out an equitable exception, however, where the defendant's "negligent act brings about [a] plaintiff's insanity." Id. at 111, 207 A.2d 513. In that instance, the Court said the defendant "should not be permitted to cloak himself with the *205 protective garb of the statute of limitations." Ibid. The Court directed the trial judge to conduct a hearing without a jury and "determine (1) whether insanity developed on or subsequent to the date of the alleged act of defendant and within the period of limitations and if so, whether that insanity resulted from the defendant's bad acts; and (2) whether plaintiff's suit was started within a reasonable time after restoration of sanity...." Id. at 112, 207 A.2d 513. In this context, the Court concluded that the word "insane" in the statute of limitations "means such a condition of mental derangement as actually prevents the sufferer from understanding his legal rights or instituting legal action." Id. at 113, 207 A.2d 513.
In Sobin v. M. Frisch & Sons, 108 N.J. Super. 99, 260 A.2d 228 (App.Div. 1969), certif. den. 55 N.J. 448, 262 A.2d 702 (1970), we addressed the question whether the plaintiff's extended period of unconsciousness and semi-consciousness allegedly resulting from the defendant's negligent act was encompassed by the word "insane" as used in N.J.S.A. 2A:14-21. In the course of our opinion, we rejected the defendant's argument that the statutory language should be construed narrowly so as to encompass only those forms of mental illness that require commitment and institutionalization. Id. at 104, 260 A.2d 228. Instead, we held that the "aim of N.J.S.A. 2A:14-21 is to relieve from the strict time restrictions any person who actually lacks the ability and capacity, due to mental affliction, to pursue his lawful rights." Ibid.
Against this backdrop, we are satisfied that mental trauma resulting from a pattern of incestuous sexual abuse may constitute insanity under N.J.S.A. 2A:14-21, so as to toll the statute of limitations. We are also convinced that plaintiff's submissions in opposition to defendants' motion for summary judgment raised genuine issues of material fact concerning whether she had the ability and capacity, due to mental affliction allegedly caused by defendants' conduct, to assert her lawful rights. We note that a plethora of recent studies has revealed the disabling psychological impact of incestuous sexual abuse. See, *206 e.g., Butler, Conspiracy of Silence: The Trauma of Incest, at 37-48, 149-173 (1978); Herman and Hirschman, Father-Daughter Incest, at 22-108 (1981); Meiselman, Incest: A Psychological Study of Causes & Effects With Treatment, at 22-50, 140-261 (1978); Russell, The Secret Trauma: Incest in the Lives of Girls & Women, at 31-35 (1986); Weinberg, Incest Behavior, at 121-156 (1976); Beck & van der'Kolk, "Reports of Childhood Incest and Current Behavior of Chronically Hospitalized Psychotic Women," 144 American Journal of Psychiatry, 1474 (1987); Swanson and Biaggio, "Therapeutic Perspectives on Father-Daughter Incest," 142 American Journal of Psychiatry, 667 (1985); Gelinas, "The Persisting Negative Effect of Incest," 46 Psychiatry 312 (1983); Herman, Russell & Trocki, "Long-Term Effects of Incestuous Abuse in Childhood," 143 American Journal of Psychiatry, 1293 (1986). The gist of these studies, as recounted in Dr. Silverman's affidavit, is that "often even long after the cycle of abuse itself has been broken, the victim will repress and deny, even to himself or herself, what has happened." According to Dr. Silverman, "[i]n many instances, this repression is so complete that the secret inside the victim becomes hidden even from [himself or herself] and can be discovered only through therapy or as a result of subsequent events which trigger off the first conscious recollection of the trauma."
Of course, we offer no opinion with respect to the truth of Susan's allegations. We stress, however, that resolution of the question presented depends critically upon a determination of plaintiff's state of mind. In that context, we have repeatedly held that issues hinging upon a party's mental state are not appropriate for resolution by way of summary judgment. See Bryen v. Krassner, 208 N.J. Super. 639, 642, 506 A.2d 803 (App.Div. 1986), certif. den. 105 N.J. 583, 523 A.2d 210 (1986); Exxon Corporation v. Wagner, 154 N.J. Super. 538, 540-541, 382 A.2d 45 (App.Div. 1977); Allen v. Planning Bd. Tp. of Evesham, 137 N.J. Super. 359, 364, 349 A.2d 99 (App.Div. 1975). This principle is particularly applicable in light of the lack of *207 any clear precedent bearing upon the precise question presented. Jackson v. Muhlenberg Hospital, 53 N.J. 138, 142, 249 A.2d 65 (1969). We thus conclude that the Law Division judge erred by granting summary judgment.

B. Duress

We are equally satisfied that Susan's allegations of duress raised genuine questions of material fact not amenable to summary disposition. Unlike insanity, we have found no statutory provision tolling the limitations period in cases of duress. So too, our research discloses no reported New Jersey opinion dealing with this issue.
However, we in New Jersey have a "long history of instances where equity has interposed to bar the statute of limitations ... where some conduct on the part of the defendant ... has rendered it inequitable that he be allowed to avail himself of the defense." Lopez v. Swyer, 62 N.J. 267, 275 n. 2, 300 A.2d 563 (1973). This principle is bottomed on equitable considerations and, hence, the exact contours of the doctrine defy rigid definition. Suffice it to say, the rule has been applied in a variety of factual and legal settings. See, e.g., Griggs v. Bertram, 88 N.J. 347, 355-364, 443 A.2d 163 (1982); Warren v. The Employers' Fire Ins. Co., 53 N.J. 308, 311-312, 250 A.2d 578 (1969); Kyle v. Green Acres at Verona, Inc., 44 N.J. at 111, 207 A.2d 513; Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 127-129, 179 A.2d 505 (1962); Friedman v. Friendly Ice Cream Co., 133 N.J. Super. 333, 337-338, 336 A.2d 493 (App.Div. 1975); Fredericks v. Farmers Rel. Ins. Co. of N.J., 80 N.J. Super. 599, 602, 194 A.2d 497 (App.Div. 1963); White v. Austin, 172 N.J. Super. 451, 455, 412 A.2d 829 (Cty.D.Ct. 1980); Tell v. Cambridge Mut. Fire Ins. Co., 150 N.J. Super. 246, 253-254, 375 A.2d 315 (Cty.D.Ct. 1977). See also Tevis v. Tevis, 79 N.J. at 438-439, 400 A.2d 1189 (Pashman, J., dissenting); Howard v. West Jersey, etc., R.R. Co., 102 N.J. Eq. 517, 520, 141 A. 755 (Ch. 1928), aff'd o.b. 104 N.J. Eq. 201, 144 A. 919 (E & A 1929). But see Lawrence v. Bauer Publishing & Printing Ltd., 78 N.J. 371, *208 376-377, 396 A.2d 569 (1979) (Pashman, J., concurring). Cf. Galligan v. Westfield Centre Service, Inc., 82 N.J. at 191-193, 412 A.2d 122; Kaczmarek v. New Jersey Turnpike Auth., 77 N.J. 329, 337-338, 390 A.2d 597 (1978); White v. Violent Crimes Compensation Board, 76 N.J. 368, 387, 388 A.2d 206 (1978); Fernandi v. Strully, 35 N.J. 434, 439-451, 173 A.2d 277 (1961).
We do not suggest that the decisions we have cited should be applied uncritically whenever a plaintiff claims that his or her failure to initiate suit in a timely fashion was caused by a defendant's wrongful act. We are, nevertheless, of the view that, within certain limits, a prospective defendant's coercive acts and threats may rise to such a level of duress as to deprive the plaintiff of his freedom of will and thereby toll the statute of limitations.
As we have pointed out, the question presented here has not been the subject of any reported New Jersey opinion. Decisions in other jurisdictions have generally accepted the theory that duress tolls the statute of limitations, at least, when, as here, it is either an element of or inherent in the underlying cause of action. See, e.g., Cullen v. Margiotta, 811 F.2d 698, 722 (2nd Cir.1987); Pahlavi v. Palandjian, 809 F.2d 938, 942-943 (1st Cir.1987); Ross v. United States, 574 F. Supp. 536, 542 (S.D.N.Y. 1983); Clary v. Stack Steel and Supply Co., 611 P.2d 80, 83 (Ala. 1980); Day v. General Elec. Credit Corp., 15 Conn. App. 677, 685-86, 546 A.2d 315, 319 (Conn. App.Ct. 1988), certif. den. 209 Conn. 819, 551 A.2d 755 (1988); Babco Industries, Inc., et al. v. New England Mer. Nat. Bank, 6 Mass. App. 929, 380 N.E.2d 1327, 1328 (Mass. App. Ct. 1978); Baratta v. Kozlowski, 94 A.D.2d 454, 458-459, 464 N.Y.S.2d 803, 806 (2d Dep't 1983); Pacchiana v. Pacchiana, 94 A.D.2d 721, 723, 462 N.Y.S.2d 256, 257 (2d Dep't 1983); Haggard v. Studie, 610 P.2d 1228, 1231 (Okl.App.Ct. 1980); Whatley v. National Bank of Commerce, 555 S.W.2d 500, 505 (Tex.Civ.App.Ct. 1977). While we have found no cases discussing the point, we add the requirement that both a subjective and an objective standard *209 must be satisfied in order for the plaintiff to prevail. Specifically, the duress and coercion exerted by the prospective defendant must have been such as to have actually deprived the plaintiff of his freedom of will to institute suit in a timely fashion, and it must have risen to such a level that a person of reasonable firmness in the plaintiff's situation would have been unable to resist. Cf. State v. Toscano, 74 N.J. 421, 442-443, 378 A.2d 755 (1977).
Applying these principles, we are convinced that plaintiff's submissions raised unresolved factual issues which can be decided only by way of a plenary hearing. Because of the nature of plaintiff's allegations, we repeat that our function on appeal from a summary judgment is not to resolve factual disputes. To reverse and remand, it is sufficient to conclude from the record, as we do, that genuine issues of material fact exist.
Accordingly, the order granting defendant's motion for summary judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.[3]
NOTES
[*] These are fictitious names, used to protect the privacy of the parties involved.
[1] As we pointed out previously, the theoretical underpinnings of the cause of action alleged in Susan's complaint are not entirely clear. In Procanik by Procanik v. Cillo, our Supreme Court barred recovery of damages for pain and suffering associated with diminished childhood resulting from birth defects. Id. at 353, 478 A.2d 755. At least to some extent, it appears that Susan, on behalf of Jane, seeks damages for impaired childhood. Without passing upon the validity of the cause of action alleged, we use the term "wrongful life" as a shorthand expression referring to Jane's separate claims against defendants.
[2] We note that the order from which this appeal was taken was not a final judgment. To be appealable without leave granted, the judgment must be final as to all parties and all issues. See Hudson v. Hudson, 36 N.J. 549, 552-553, 178 A.2d 202 (1962); Nicholas v. Sugar Lo. Co., 192 N.J. Super. 444, 450, 471 A.2d 44 (App.Div. 1983), certif. den. 96 N.J. 284, 475 A.2d 582 (1984). The summary judgment order did not satisfy this test, for it left unadjudicated the merits of Jane's damage claims. It would thus appear that the order was interlocutory and was not appealable as of right. See R. 2:2-3(a)(2). To avoid any confusion, we will grant the necessary leave to appeal nunc pro tunc in the interests of the prompt disposition of the issue presented. See Stigliano v. St. Rose High School, 198 N.J. Super. 520, 523 n. 1, 487 A.2d 1260 (App.Div. 1984); Ibberson v. Clark, 182 N.J. Super. 300, 302-303, 440 A.2d 1157 (App.Div. 1982); Yuhas v. Mudge, 129 N.J. Super. 207, 209, 322 A.2d 824 (App.Div. 1974).
[3] Although Susan in her appellate brief challenged the Law Division's order appointing a guardian ad litem to represent Jane's interest, that contention has since been abandoned. While not directly raised here, we question the validity of the Law Division judge's order transferring Jane's action to the Family Part. As we noted earlier in our opinion, the exact nature of the cause of action alleged on Jane's behalf is not entirely clear. It is plain, however, that Jane's claims go beyond a demand for support under the New Jersey Parentage Act (N.J.S.A. 9:17-38 to -59). Should Susan prevail at the remand hearing concerning the statute of limitations question, her independent claim and Jane's causes of action should probably be tried together to prevent the possibility of duplicative recoveries, for reasons of economy and to avoid inconsistent results. See Procanik by Procanik v. Cillo, 97 N.J. at 356, 478 A.2d 755.